```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALEX JAMIL PETERSON,          :    CIVIL ACTION
                              :    NO. 03-5368
          Plaintiff,          :
                              :
     v.                       :
                              :
JULIE KNAUER et al.,          :
                              :
          Defendants.         :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          February 25, 2008

Before this Court are Alex Peterson's 42 U.S.C. § 1983 and Pennsylvania state law claims against defendants Julie Knauer and the Graterford Medical Health Department. He avers that both defendants violated the Eighth Amendment prohibition on cruel and unusual punishment, specifically alleging that he was misdiagnosed as having a heart condition, that the medication prescribed for this misdiagnosis caused him to suffer injury, and that the defendants did nothing to remedy the situation despite his numerous requests for help. Defendants now move for summary judgment.

I.   FACTUAL BACKGROUND

Peterson is currently serving a prison sentence at the State Correctional Facility ("SCI") at Graterford in Pennsylvania on charges of rape and kidnapping. Convicted in 1989, plaintiff was originally assigned to SCI Graterford, reassigned to SCI

Dallas and then reassigned again, in May of 1993, back to SCI Graterford.  It was during his initial stint at SCI Graterford where he was originally diagnosed with having an enlarged heart.  Pl.'s Dep. 18:6, Feb. 17, 2007.  In 1990, while imprisoned at SCI Dallas, he began to complain of swollen legs, left arm numbness and that he could "feel his heartbeat."  Pl.'s Dep. 26:9-17.  He was prescribed, by the prison medical staff, Lanoxin,[1] Lasix and Slow-K,[2] medications which he continued to take up until October 21, 2001, when he first met with Graterford prison physician, Dr. Iccarino.[3]  Peterson requested from Dr. Iccarino an explanation of why he had been diagnosed as a "heart patient."  Allegedly, Dr. Iaccarino then told Peterson that he "did not need [heart medicine]."  Compl. ¶ 19.

On December 1, 2001, April 18, 2002, and November 8, 2002, Peterson filed administrative grievances with the prison authorities for failing to correct the alleged misinformation in his medical files.  Pl.'s Dep., Exs. 2, 9, 15.  The prison health administrator[4] was responsible for responding to these grievances

---

[1] Also called Digoxin.

[2] Compl. ¶ 22.

[3] From 1990 until 2001, Peterson was also prescribed nitroglycerin patches and had been issued two medical-alert bracelets, one indicating that he was a heart patient, and one stating that he had dysrhythmia.

[4] It appears as though there were two prison health administrators, Julie Knauer and Donna Hale, who shared in the duties of the position.  Only Knauer is named as a defendant in

and in Peterson's case, each grievance was in fact responded to in a timely fashion. Pl.'s Dep. Exs. 3, 10, 16. On January 21, 2002, Peterson wrote a letter directly to Knauer, "bringing her attention to [the findings of Dr. Smith[5]]." Pl.'s Dep. Ex. 4. On January 27, 2003, Peterson approached Knauer at a "town meeting"[6] and asked her to remove the "erroneous data in his medical files." Compl. ¶ 33. Lastly, Peterson alleges that on March 3, 2003, he contacted Knauer directly to express his discontent with the diagnoses of the prison physicians and that she failed to respond.

II.  PROCEDURAL HISTORY

Peterson filed his initial complaint, pro se,[7] on August 27, 2003. On September 24, 2003, defendants[8] removed the

---

this case.

[5] Dr. Smith was one of the physicians at SCI Graterford.

[6] A town meeting is a question-and-answer session at which prisoners can direct their questions directly toward prison officials.

[7] This case was placed in suspense in February, 2005, to allow the Clerk's office to find plaintiff counsel from the prisoner civil rights panel. In December, 2005, the Court denied plaintiff's request for appointment of counsel because at least two attorneys rejected appointment after reviewing the case. Plaintiff was instructed to proceed pro se or to retain private counsel and chose the former.

[8] In addition to the Knauer and Graterford, Peterson's initial complaint listed doctors Smith, Kubayat and Robinson as well Wexford Health Care Services Inc. as defendants. The claims

case to this Court. The Court denied the defendants' motion to dismiss in a December 15, 2003, order. In an attempt to streamline the issue, the defendants were ordered to depose the plaintiff and then, if necessary, file a motion for summary judgment. After the plaintiff was deposed on February 17, 2007, the defendants did file a summary judgment motion on May 4, 2007. The plaintiff moved to extend the time within which to respond and to take discovery. The Court granted plaintiff's motion and ordered the discovery to be provided. The Court then set October 17, 2007, as the deadline for the plaintiff to respond to defendants' motion. On October 16, 2007, plaintiff asked for additional discovery and another extension of time within which to respond to defendants' summary judgment motion.[9] On December 27, 2007, the Court denied plaintiff's request for further

---

against Doctors Smith and Kubayat were severed from this proceeding on February 2, 2005 and the claims against Doctor Robinson and Wexford Health Care Services Inc. were dismissed on May 21, 2007.

[9] At this stage of the proceeding the Court determined that Peterson has been afforded every opportunity to develop his case and that any further discovery permitted would not affect the Court's adjudication of the defendants' motion for summary judgment. See Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (a party seeking to reopen discovery in response to a summary judgment motion must demonstrate: (1) the particular information sought; (2) how the information would preclude summary judgment; and (3) why it has not previously been obtained). Peterson has made vague demands for the "cardiac doctors' data" which, even if produced, would not allow Peterson to create a genuine issue of material fact or dispute the defendants' entitlement to judgment as a matter of law as to the federal claims.

discovery, but granted him an enlargement of time within which to respond to defendants' motion. After yet another request for an extension of time to respond, which the Court granted on January 17, 2008, the plaintiff filed his response on February 8, 2008. The Court will now grant the defendants' motion for summary judgment.

III. DISCUSSION

    A.   <u>Summary Judgment</u>

         A court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. <u>Id.</u> at 248-49. "In considering the evidence, the court should draw all reasonable inferences against the moving party." <u>El v. Se. Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party:

the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

B. Federal Claims

42 U.S.C. § 1983 provides a cause of action for an individual whose constitutional rights are violated by those acting under the color of state law. It states;

> "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983.

1. SCI Graterford Medical Health Department

As the Supreme Court has often reiterated, the "person" requirement embodied in the first sentence of the statute is rarely negotiable. Hafer v. Melo, 502 U.S. 21, 25-27 (1991) (holding that neither a state nor its agencies are to be considered "persons" for § 1983 purposes and are therefore not subject to suit under the statute); Will v. Mich. Dep't of State

6

Police, 491 U.S. 58 (1989) (an entity with Eleventh Amendment[10] Immunity is not a "person" within the meaning of § 1983). Departments of correction have consistently been regarded as having no existence apart from the state. Lavia v. Penn. Dept. of Corr., 224 F.3d 190, 195 (3d Cir. 2000); Bey v. Penn. Dept. of Corr., 98 F. Supp. 2d 650, 657 (E.D. Pa. 2000). And, because it is agreed that the Greaterford Medical Health Department is a subdivision[11] of the Pennsylvania Department of Corrections, it too has no existence apart from the state and is not a "person" for purposes of § 1983 claims. Fischer v. Cahill, 474 F.2d 991, 992 (3d Cir. 1973) (holding that a prison medical department cannot be sued under § 1983 as it is not a person); see also Bey, 98 F. Supp. 2d at 657 (holding that correctional program review committees are arms of the state since they are run by and through the DOC).

Here, summary judgment must be granted to defendant Graterford Medical Health Department with regard to Peterson's § 1983 claims as it is not a "person" under the statute. See Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103

---

[10] Defendants concede that Eleventh Amendment immunity is waived in this case as the defendants removed it to federal court. See Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613 (2002) (holding that Eleventh Amendment immunity is waived when government party removes the case to federal court). This, however, does not affect the application of Will.

[11] Plaintiff concedes as much in his complaint. (Compl. ¶ 68).

F.3d 1165, 1173 (3d Cir. 1997).

        2.   <u>Julie Knauer</u>

           a.   <u>Official Capacity</u>

Julie Knauer was at all relevant times, one of two health care administrators at SCI Graterford. Like the Graterford Medical Health Department, to the extent that Knauer is being sued in her official capacity, she is not subject to liability under § 1983. The Supreme Court has held that "[a] suit against a state official in his or her official capacity is not a suit against the official, but rather a suit against the official's office ... As such, it is no different than a suit against the state itself." <u>Will</u>, 491 U.S. at 71.

Peterson is seeking only monetary damages, as opposed to injunctive relief, thus his claims § 1983 claims against Knauer in her official capacity must fail. <u>Ex Parte Young</u>, 209 U.S. 123, 159-60 (1908); <u>Edelman v. Jordan</u>, 415 U.S. 651, 654 (1974).

           b.   <u>Individual Capacity</u>

By contrast, Knauer can be held liable in her individual capacity for any violations of the plaintiff's civil rights which she caused while acting under the color of state law.

The state has an obligation to provide medical care to those it imprisons and deliberate indifference to the serious medical needs[12] of a prisoner constitutes the "unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). The deliberate indifference standard can be met in a variety of circumstances such as the doctoring of medical records to reflect that a treatment was ordered when in fact it was not prescribed,[13] refusing to divulge the ingredients in a medication after a prisoner states that he is allergic to penicillin[14], or the refusal to administer pain

---

[12] A medical need is serious "where denial or delay [of treatment] causes the inmate to suffer life-long handicap or permanent loss," or "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." King v. Leftridge-Byrd, 2005 U.S. Dist. LEXIS 645, *5 (E.D. Pa. Jan. 14, 2005) (quoting Monomouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In this unusual scenario, the Court is confronted with a case in which there is no demonstrated serious medical need; Peterson alleges that he did not have a heart condition and, in relation to the defendants' conduct, Peterson was under the impression that he did not require the prescribed medication at all times. He does not allege that he ever took the heart medication after his 2001 consultation with Dr. Iccarino or that his taking of medication after that date led to serious medical injury. See Pennsylvania ex rel. Gatewood v Hendrick, 368 F.2d 179 (3d Cir. 1966) (state prisoner who gave no indication that he sustained serious physical injury as result of alleged inadequate treatment, failed to state claim for which relief could be granted under 42 U.S.C. § 1983).

[13] Green v Branson, 108 F.3d 1296 (10th Cir. 1997)

[14] White v Napoleon, 897 F.2d 103 (3d Cir. 1990).

medication contrary to a surgeon's orders.[15] Deliberate indifference can also manifest when an official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837,(1994). But, only deliberate conduct merits constitutional protection; inadvertent failure to provide adequate medical care cannot be said to constitute and unnecessary and wanton infliction of pain. Id. at 105; see also Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) (holding that in a § 1983 action, a prisoner must show more than mere negligence); Fischer v. Cahill, 474 F.2d at 992 (holding that a simple misdiagnoses do not meet the deliberate indifference standard).

However, "if a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). The Third Circuit has held that even when a non-physician completely ignores a prisoner's complaints, the fact that the non-physician is aware of the prisoner's on-going treatment by the prison doctor will preclude liability for the non-physician. Durmer, 991 F.2d at 69.[16]

---

[15] Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1971).

[16] However, the facts in this case are far less damning for defendant Knauer; three out of the four complaints made by Peterson to Knauer were met with at least some response.

At issue in this case are six instances in which Peterson could potentially claim that Knauer exhibited deliberate indifference toward his serious medical needs.  These events all postdate October 21, 2001, when Peterson was evaluated by Dr. Iccarino, the first physician to indicate that Peterson did not have a heart condition.[17]  The Court will address each potential claim seriatim.

Peterson's initial grievance was filed on December 1, 2001.  Knauer responded by scheduling a meeting with Peterson and with one of Peterson's doctors, Ralph Smith.  On January 11, 2002, Knauer wrote up a summary of this meeting, Pl.'s Dep. Ex. 3, including a note that an EKG and an x-ray were ordered.  Plaintiff concedes that he did in fact receive these tests.  Pl.'s Dep. 75:4-9.

Peterson's second grievance was filed on April 18, 2002.  Pl.'s Dep. Ex. 9.  He received a response from Donna Hale, Knauer's counterpart,[18] on May 9, 2002, which detailed Peterson's medical history and instructed him to report to the dispensary if he experienced any pain or discomfort.  Pl.'s Dep. Ex. 10.

Peterson's third grievance was filed on November 8, 2002. Pl.'s Dep. Ex. 15.  On December 13, 2002, Knauer responded

---

[17] Prior to this date, the misdiagnosis would have amounted to negligence, not deliberate indifference.  <u>Fisher</u>, 474 F.2d at 992.

[18] <u>See</u> <u>supra</u> note 5.

11

to Peterson in writing, stating that a heart murmur and congestive heart disease may be totally unrelated, and that an echocardiogram would be ordered.[19]  Pl.'s Dep. Ex. 16.  These were the only grievances filed by Peterson.

Peterson's December 1, 2001, and November 8, 2002, grievances and Knauer's answers thereto show that (1) Knauer knew that Peterson was being treated by a prison physician and (2) Knauer did in fact respond, scheduling a meeting in one instance with the "head medical man" (Dr. Smith), Pl.'s Dep. 70:16, and by discussing a physician's evaluation of Peterson in the other.  As for the grievance filed on April 22, 2002, Knauer had no involvement in responding to it.  This grievance was assigned to Donna Hale.  Assuming that any failure to respond by Hale would rise to deliberate indifference (a doubtful assumption), Knauer would not be subject to § 1983 liability in this instance as "a defendant in a civil rights action must have personal involvement to be liable."  Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003).  Any liability for failing to respond to the April 22, 2002, grievance would attach to Hale, not Knauer.[20]

---

[19] An echocardiogram was in fact administered shortly thereafter.  Pl.'s Dep. 99:24.

[20] Alternatively, Knauer, in her position as Health Care Administrator at Graterford, cannot be held liable under § 1983 simply by virtue of her supervisory role.  Hussmann v. Knauer, 2005 U.S. Dist. LEXIS 2779, *10 (E.D. Pa., Feb. 22, 2005); Thomas, 155 F. Supp. 2d at 414 (holding that Knauer cannot be held liable in a § 1983 claim by virtue of her supervisory role).

On January 21, 2002, Peterson wrote a letter to Knauer and cannot recall now whether he received a response.[21] However, this letter made no demands, requests or inquiries. In fact, the letter concluded, "this letter is to bring your attention that [sic] the findings of grievance No. 8881, by Dr. Smith are incorrect false, fraudulent, erroneous and at all times not to be believed." Pl.'s Dep. Ex. 4. Regardless of whether Knauer responded to this letter, she cannot be held to be deliberately indifferent for failing to respond to Peterson's expressed unhappiness with Dr. Smith's medical judgment. Ascenzi v. Diaz, 2007 U.S. Dist. LEXIS 23475, *12 (W.D. Pa. Mar. 30, 2007) (health care administrator at a prison, was held not to be liable under the plaintiff's § 1983 claim because he "[could not] be considered deliberately indifferent for failing to second-guess [plaintiff's] treating physician's assessment of his medical needs").

Peterson also alleges that he approached Knauer at the "town meeting" held on January 27, 2003, and complained that the "erroneous data" still had not been removed from his file. Pl.'s Dep. 110:1-7. Knauer responded that she did not have the authority to correct data added to his file by a treating physician, and that he should direct such a complaint to his

---

[21] At Peterson's deposition, when asked whether he had ever received a response to this letter he replied, "I believe I did, I'm not sure, I might have." Pl.'s Dep. 81:25.

physician, Dr. Robinson.  Id.  Knauer's response, that she was not permitted to perform the acts requested by Peterson and directing Peterson to the physician she knew to be treating him at the time, does not rise to deliberate indifference.

Finally, Peterson claims that in one instance, March 3, 2003, Knauer purportedly ignored "pleading for help on this outstanding matter of [Peterson's] alleged heart condition." Compl. ¶ 39.  But, there has been no documentation of this communication, nor any mention of it outside of a single paragraph in the plaintiff's statement of the facts.  Assuming, without deciding, that such a complaint was in fact made, it necessarily would have mirrored Peterson's previous five complaints, all within 16 months of one another and all identical in scope and to which Knauer had responded.  And, even if this complaint were made, given that Knauer knew Peterson was being treated by the prison physician, a claim that Knauer never responded to the complaint does not rise to the level of a constitutional violation.  See Hussman v. Knauer, 2005 U.S. Dist. LEXIS 2779, *10 (E.D. Pa. Feb. 22, 2005) (knowledge that the defendant was being treated by prison physicians absolved prison health administrator (Julie Knauer) from liability)[22]; Thomas v.

---

[22] The Court in Hussman did state that liability may have manifested had Knauer had reason to believe that the physicians were refusing to treat the plaintiff.  However, both in that case and the case at present, the evidence suggests that the plaintiff was receiving extensive treatment.

14

Zinkel, 155 F. Supp. 2d 408, 413-14 (E.D. Pa. 2001) (granting defendant health care administrator's[23] motion to dismiss because officials in administrative capacities cannot be held liable under § 1983 when the prisoner is being treated by a physician).

The bulk of the plaintiff's response to defendants' motion for summary judgment is devoted to a detailed review of the evidence indicating that he no longer, or never had, heart problems.  This argument misses the mark.  Even if the Court were to concede the fact that the plaintiff was misdiagnosed by the prison physician, Kanuer did everything that was required in her position as prison health administrator.  Summary judgment in favor Knauer will be granted as to plaintiff's federal claims.

    C.   State law claims

In addition to his federal claims, Peterson alleges state law claims of negligence against Knauer and the Health Department in that because of said negligence, he received inadequate medical care.  However, as there are no federal claims remaining against either defendant, the Court will exercise its discretion and dismiss the supplemental state law claims.[24]

---

[23] The defendant in this case was also Julie Knauer, serving in the same capacity as she does at present.

[24] 28 U.S.C. § 1367 provides:

    § 1367.  Supplemental Jurisdiction

IV.   CONCLUSION

For the above stated reasons, defendants' motion for summary judgment will be granted as to all federal claims.[25]  All of plaintiff's state law claims will be dismissed without prejudice.

---

>       (c) The district courts may decline to exercise
>       supplemental jurisdiction over a claim under
>       subsection
>
>       (a) if
>
>   ...
>
>       (3) the district court has dismissed all claims
>       over which it has original jurisdiction.

[25]  It is noted that Peterson has not shown that he has been injured by the alleged violations and he conceded as much at his deposition.  Pl.'s Dep. 130:2-3.  However, given the resolution of the case stated above, the Court need not consider the applicability of summary judgment on this alternate basis.

```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ALEX JAMIL PETERSON,           :      CIVIL ACTION
                               :      NO. 03-5368
          Plaintiff,           :
                               :
     v.                        :
                               :
JULIE KNAUER et al.,           :
                               :
          Defendants.          :
```

ORDER

     **AND NOW**, this **25th** day of **February, 2008,** it is hereby **ORDERED** that defendant's motion for summary judgment (doc. no. 49) with regard to plaintiff's federal claims is **GRANTED**. The plaintiff's state law claims are **DISMISSED without prejudice.**

    **IT IS FURTHER ORDERED** that the plaintiff's motion to obtain non-defendant subpoenas (doc. no. 58) is **DENIED.**

    **IT IS FURTHER ORDERED** that the plaintiff's motion to be furnished discovery subpoenas (doc. no. 62) is **DENIED.**

    **AND IT IS SO ORDERED**

                                             **S/Eduardo C. Robreno**
                                             **EDUARDO C. ROBRENO, J**